## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## SHREVEPORT DIVISION

WESTON MERRIOTT                               CIV. ACTION NO. 5:23-01421

VERSUS                                        JUDGE TERRY A. DOUGHTY

CITY OF BOSSIER CITY ET AL                    MAG. JUDGE KAYLA D. MCCLUSKY

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, are motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) filed by Defendants City of Bossier, Jeffrey Free, David Montgomery, Jeffery Darby, and Charles Jacobs.  [docs. # 13, 15, 55-56].  The motions are opposed.  [docs. # 22, 33, 57-58].

For reasons assigned below, it is recommended that the motions be GRANTED IN PART and DENIED IN PART.

## FACTS AND PROCEDURAL BACKGROUND

Plaintiff Weston Merriott ("Merriott") filed the instant action on October 9, 2023.  [doc. #1].  The controlling pleading ("the Amended Complaint") was filed on May 24, 2024.  [doc. #54].  The Amended Complaint names the City of Bossier ("the City"), as well as President of the Bossier City Council Jeffrey Free ("Free"), Council members David Montgomery ("Montgomery") and Jeffery Darby ("Darby"), and Bossier City Attorney Charles Jacobs ("Jacobs") (collectively, "the Individual Defendants") as Defendants.  *Id.*  Free, Montgomery, and Darby are sued in both their official and individual capacities.  *Id.* at pp. 3-5.  Jacobs is sued only in his official capacity.  *Id.* at p. 5.  Merriott seeks damages and declaratory and injunctive relief arising from alleged violations of the First Amendment to the United States Constitution.

*Id.* at pp. 29-30.  He also seeks civil penalties for alleged violations of Louisiana's Open Meetings Law and declaratory relief for alleged violations of the Louisiana Constitution.  *Id.*

This lawsuit arises from a series of events surrounding meetings of the Bossier City Council ("the Council").  On July 18, 2023, the Council held a regular public meeting.  [doc. #54, p. 6].  At the start of the meeting, City Clerk Phyllis McGraw ("McGraw") notified the attendees of the Council's governing rules.  *Id.*[1]  During a public comment period, Merriott, a local journalist, spoke in favor of implementing term limits for the City's elected officials.  *Id.*

The Council held another public meeting on August 1, 2023, ("the August 1 Meeting"). *Id.* at p. 7.  During a public comment period, Merriott "criticiz[ed] the Defendants['] continued inaction" on the term limit issue and "criticized the decision of some council[]members to delay action" on the issue by seeking outside counsel.  *Id.*  He "questioned the impartiality of [the] chosen outside counsel,[2] noting that [the attorney had] represented Councilmember Montgomery in a deposition, years prior."  *Id.*  Free interrupted Merriott, directing him to "stay on topic."  *Id.*

---

[1] The Complaint quotes McGraw as stating the following:

> The City Council asks for order and decorum at our meetings.  Please silence your cell phones.  Anyone wishing to address the Council on any agenda item may approach and state their name and address for the record and shall be permitted three minutes to make their comments on the particular item that's up for discussion, with up to four speakers per side.  All other audience members are asked to please observe the meeting quietly and if there is a need for audience members to hold a conversation or take a phone call you're asked to please step out of the meeting. City Council appointed Sergeant at Arms have been instructed to maintain decorum and ask anyone in violation to step out of the meeting in order to maintain orderly conduct of the meeting.

*Id.*  This language draws on the Council's Resolution No. 56 of 2021 ("the Decorum Policy").  The Decorum Policy specifies that "no more than 4 speakers per side of the argument [under] discussion per Agenda item" may participate during public comment periods.  [doc. #54-1, p. 4].  This provision is herein referred to as "the Speaker Limit."

[2] Merriott does not identify "outside counsel" in this paragraph.

Montgomery then requested that City attorney Jacobs respond to Merriott's assertions concerning the outside counsel, which Jacobs called "absolutely false." *Id.*

Two weeks later, the Council held a public meeting on August 15, 2023 ("the August 15 Meeting"). *Id.* at p. 8. At the start of this meeting, the Clerk, McGraw, read directly from portions of the Decorum Policy. *Id.* First, she stated that "[a]ny person making personal, impertinent or slanderous remarks or who shall become boisterous while addressing the Council shall be forthwith, by the President Pro-Tem, barred from further audience before the Council, unless permission to continue [be] granted by a majority vote of the Council." *Id.*[3] McGraw then stated that questions were to be directed to the Council "as a body," not to individual members, and warned the attendees that the Sergeant at Arms had been "instructed to maintain decorum." *Id.* During the public comment period later in the meeting, Merriott again spoke about term limits for elected officials. *Id.* at p. 9. Free interrupted Marriott and instructed him to "stay on topic and to only ask questions." *Id.* Darby then instructed McGraw to read the portion of the Decorum Policy containing the Conduct Prohibitions and Audience Ban, which she did. *Id.*

Five days later, Merriott sent a letter to members of the Council, Jacobs, and the City's Mayor "requesting that the Council respect his First Amendment rights and refrain from interrupting him [at Council meetings]." *Id.* at p. 10.

At the Council's meetings on August 29 and September 5, 2023 ("the September 5 Meeting"), McGraw again read the Decorum Policy. *Id.* During the public comment period of the September 5 Meeting, Merriott once again spoke about the term limit issue and reiterated his

---

[3] The undersigned refers to the provision prohibiting "personal, impertinent or slanderous remarks" and boisterous conduct as "the Conduct Prohibitions." The provision allowing attendees to be "barred from further audience" is referred to as "the Audience Ban."

concerns from the August 1 Meeting about the impartiality of the City's outside counsel.  *Id.*
Montgomery interrupted Merriott and asked Free to remove him from the meeting.  *Id.* at p. 11.
Merriott continued speaking.  *Id.*  Montgomery declared that Merriott's "words had nothing to do
with the agenda item" under discussion and again called for his removal.  *Id.*  Free "instructed
Merriott to stick to the agenda and to not make any accusations against council[]members."  *Id.*
Merriott was not removed from the meeting.  *Id.*

Immediately after the September 5 Meeting concluded, Darby and Montgomery, as well
as McGraw and Council members Vince Maggio and Don Williams, met in private ("the Off-
the-Record Conference") to "speak about changing the rules of public comment to limit
comment to the beginning of [meetings.]"  *Id.* at pp. 12-13.  Darby asked McGraw to "draft new
rules that would eliminate public comment at each agenda item."  *Id.* at p. 12.  Darby and
Montgomery then "counted if they would have enough members to make the resolution in
Defendant Free's absence."  *Id.*  Montgomery asked McGraw, "Free won't be here, so is 4 to 2
enough?"  *Id.*  McGraw confirmed this vote breakdown would be sufficient to pass the
resolution.  *Id.*

Audio of the Off-the-Record Conference was released by a local news outlet shortly
thereafter.  *Id.*  In response to the leaked audio, Jacobs sent an email to the Council "and others"
on September 8, 2023, indicating that an internal investigation had commenced and "there
should not be any discussion about [the Off-the-Record Conference] without" first consulting his
office.  *Id.* at p. 13.[4]  Jacobs also "threatened to call the FBI to bring wiretapping charges
against the person who released the audio."  *Id.*

---

[4] Jacobs' directive is herein referred to as "the Gag Order."

On an unspecified date after the September 5 Meeting, Merriott filed "an open meetings complaint" with the Louisiana Attorney General concerning "his treatment by the City Council and the Council's subsequent closed meeting." *Id.* at 14.

At the Council's meeting on September 19, 2023 ("the September 19 Meeting"), Merriott again spoke during the public comment period, this time objecting to the minutes of the September 5 Meeting referring to his comments as "disruptive." *Id.* at p. 12.

On October 6, Jacobs responded to the letter Merriott had previously sent to the Louisiana Attorney General ("the October 6 Letter"). *Id.* at 14; *see also* [doc. #54-2].[5] The October 6 Letter refutes several contentions Merriott posed in his earlier letter. In the Letter, Jacobs denies the allegations "that a member of the public was threatened with arrest while giving public comment" during the September 5 Meeting. [doc. #54-2, p. 1]. He also denies that the same member of the public "was instructed that he could not mention members of the Council or their actions." *Id.* at p. 2. Jacobs asserts that a "quorum of the Council" did not meet to deliberate prior to the September 5 Meeting. *Id.* He further indicates that the Off-the-Record Conference was "an impromptu and unplanned gathering of four City Council members" that included "a brief discussion concerning the timing of public comment in reaction to the actions of [Merriott.]" *Id.* Jacobs notes that Montgomery "never formally 'polled' or asked the four individuals concerning their individual vote." *Id.*

Merriott filed his initial complaint on October 9, 2023. [doc. #1]. On December 1, 2023, the City filed a motion to dismiss, and the Individual Defendants also filed a separate motion to dismiss. [doc. #13]; [doc. #15]. The City's motion is predicated on various grounds, including failure to state a claim and lack of standing. [doc. #18]. The Individual Defendants seek

---

[5] The October 6 Letter has been incorporated into the pleadings. *See infra* section I.a.

dismissal of the official capacity claims against them and challenge the other claims on various grounds. [doc. #15]. Merriott filed his opposition to the Individual Defendants' motion on January 25, 2024, [doc. #22], and to the City's motion on February 6, 2024. [doc. #33]. The City had earlier filed a reply to Merriott's opposition on January 30, 2024. [doc. #32].[6]

On April 5, 2024, Merriott requested leave to file an amended complaint. [doc. #43]. After briefing from all parties, the undersigned granted his motion on May 21, 2024. [doc. #53]. The Amended Complaint became the operative pleading when it was filed on May 24, 2024. [doc. #54]. The City and the Individual Defendants filed supplemental motions to dismiss on June 4, 2024. [docs. #55-56]. The City incorporated by reference its previous memorandums in support of its first motion to dismiss, [doc. #55, p. 2], while the Individual Defendants incorporated all of the City's previous briefings. [doc. #56, pp. 1-2]. Merriott filed opposition memoranda on June 14, 2024, both of which incorporate his prior opposition memoranda. [docs. #57-58]. On June 25, 2024, the City and the Individual Defendants filed replies to Merriott's opposition. [docs. #62, 64].[7]

Briefing is complete. Accordingly, this matter is ripe.

## Analysis

The undersigned first sets forth the relevant legal standards of review and then analyzes Merriott's claims.

---

[6] Merriott's opposition memo was filed after receiving leave of court to exceed the standard page limit. *See* [doc. #30]. This resulted in the City having an opportunity to reply to the opposition memo prior to that memo being officially filed.

[7] In their reply, Free, Montgomery, and Darby clarified that they had withdrawn their defense of qualified immunity, which was invoked in their initial motion to dismiss. [doc. #64, p. 3].

I.      **Standards of Review**

        a.  *Federal Rule of Civil Procedure 12(b)(6)*

        The Federal Rules of Civil Procedure sanction dismissal where the plaintiff fails "to state

a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  To withstand a motion to

dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plausibility simply calls for enough factual

allegations to raise a reasonable expectation that discovery will reveal evidence to support the

elements of the claim.  *Twombly*, 550 U.S. at 556.  "[P]laintiffs must allege facts that support the

elements of the cause of action in order to make out a valid claim," *City of Clinton, Ark. v.*

*Pilgrim's Pride Corp.*, 632 F.3d 148, 152-53 (5th Cir. 2010), but "[t]hreadbare recitals" of those

elements "supported by mere conclusory statements" are insufficient to survive a motion to

dismiss.  *Iqbal*, 556 U.S. at 678.  Factual pleadings that are "merely consistent with" a

defendant's liability "stop[] short of the line between possibility and plausibility."  *Id.* (quoting

*Twombly*, 550 U.S. at 557).  All well-pleaded facts are accepted as true and viewed in the light

most favorable to the plaintiff, *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th

Cir. 2007), although courts "are not bound to accept as true a legal conclusion couched as a

factual allegation."  *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286

(1986)).  In conducting the Rule 12(b)(6) analysis, courts must consider the complaint in its

entirety, as well as documents incorporated into the complaint by reference and matters of which

the court may take judicial notice. *Jackson v. City of Hearne*, 959 F.3d 194, 204-05 (5th Cir. 2023) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)).[8]

    *b.  42 U.S.C. § 1983*

Section 1983 provides that any person who, under color of state law, deprives another of "any rights, privileges or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983. The statute does not create any substantive rights; it simply provides a remedy for the rights designated therein. *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997). "Thus, an underlying constitutional or statutory violation is a predicate to liability under § 1983." *Id.* (quoting *Johnston v. Harris Cnty. Flood Control Dist.*, 869 F.2d 1565, 1573 (5th Cir. 1989)).

Section 1983 suits may be brought against an individual in their official or individual capacity, as well as against a government entity. *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009) (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997)). An individual-capacity suit seeks to impose liability on a "government officer for actions taken under color of state law." *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358 (1991). A plaintiff bringing an individual-capacity claim need only show that "the official, acting under color of state law, caused the [alleged] deprivation of a federal right." *Goodman*, 571 F.3d at 395 (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). An official-capacity suit is generally

---

[8] The undersigned notes that Merriott includes two hyperlinks in the Amended Complaint. [doc. #54, pp. 11, 13]. The Western District of Louisiana's local rules provide that "[m]aterials accessed by hyperlink will not be part of the record." L. R. 5.7.13. This rule does not preclude the Court from taking judicial notice of records referenced in the pleadings. *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (indicating courts analyzing motions to dismiss may exercise judicial notice pursuant to Federal Rule of Evidence 201(b)). Furthermore, Merriott has included the content located at the hyperlinks as exhibits to the Amended Complaint. [doc. #54-5].

"another way of pleading an action against an entity of which an officer is an agent."  *Goodman*, 571 F.3d at 395 (quoting *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658, 690 n.55 (1978)).  Therefore, an official-capacity suit is treated as a suit against the real party in interest— the government entity— not against the official personally, *Graham*, 473 U.S. at 166, and is referred to as a municipal liability or *Monell* claim.  *Edwards v. City of Balch Springs*, 70 F.4th 302, 307 (5th Cir. 2023).  To succeed on a *Monell* claim, a plaintiff must prove that he was deprived of a federally protected right (1) pursuant to an official municipal policy (2) promulgated by the municipal policymaker (3) that was the moving force behind the constitutional violation.  *Id.*

## II.    Official Capacity Claims

Merriott sues Free, Montgomery, and Darby in both their official and individual capacities and Jacobs only in his official capacity as City Attorney.  [doc. #54, pp. 3-5].  The Individual Defendants argue that the official-capacity claims brought against them should be dismissed as "duplicative" and "redundant" of the claims lodged against the City.  [doc. #56-1, pp. 7-8].

In actions where a defendant-official is sued in both his individual and official capacities, and a municipality is also sued, "there potentially exists an overlapping cause of action" whereby "[t]he official-capacity claims and the claims against the governmental entity essentially merge." *Turner v. Houma Mun. Fire & Police Civ. Serv. Bd.*, 229 F.3d 478, 485 (5th Cir. 2000).  As discussed *supra*, claims against defendant-officials in their official capacity "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Graham*, 473 U.S. at 165 (quoting *Monell*, 436 U.S. at 690 n.55); *see also Jones v. City of Houston*, 756 F.App'x 341, 346 n.2 (5th Cir. 2018) ("We treat suits against municipal officials in

their official capacities as suits against the municipality itself."). Such claims should be treated as a suit against the government entity "[a]s long as [the entity] receives notice and an opportunity to respond." *Graham*, 473 U.S. at 166.[9]

Merriott readily admits that the Individual Defendants were acting in their official capacities. [doc. #22, p. 12] ("[The Council members were] unquestionably acting in their official capacities in the conduct challenged [in the instant suit.]"). As the Individual Defendants were acting in their official capacities, claims against them in that capacity merely represent another way to plead an action against the City. The City is also a Defendant in the instant case, meaning it has received notice of the claims and had an opportunity to respond. It is thus appropriate to dismiss the official-capacity claims against Free, Montgomery, Darby, and Jacobs.

Merriott's arguments for leaving these claims untouched fall into two general categories. First, he argues that if the official-capacity claims are dismissed, and the Court ultimately grants declaratory and injunctive relief, then that relief may not be enforceable against the Individual Defendants. *Id.* at pp. 9-12; [doc. #58, pp. 8-9]. While it may sometimes be the case that a favorable judgment cannot be enforced, such concern is not valid here. As Free, Montgomery, Darby, and Jacobs were acting in their official capacities, any liability they have incurred ultimately lies with the City, not with the individuals. Consequently, it is entirely appropriate for the City – the real party in interest as to the official-capacity claims – to be the party facing potential injunctive and declaratory remedies. Furthermore, an injunction against the City

---

[9] This is relevant in part because "an award of damages against an official in his personal capacity can be executed only against the official's personal assets, [but] a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself." *Id.*

concerning use of the Decorum Policy or enforcement of the Gag Order would extend to those responsible for implementation and enforcement of the relevant policies.[10, 11]

The cases Merriott cites in support of this argument do not convince the undersigned that it is appropriate to maintain the official-capacity claims. The majority of these citations are to trial court decisions from outside the Fifth Circuit, while one comes from a Supreme Court dissent; thus, they are all only persuasive authority. *See* [doc. #58, pp. 9-10]. Merriott cites two cases from the Fifth Circuit, but both are from different districts and neither is applicable to the instant matter. In the first of these cases, *Sanders v. Collier*, the official-capacity claims against an individual official were allowed to proceed when the claims against the supervising entity were dismissed at the same time. No. 22-cv-139, 2022 WL 2195801 (E.D.Tex. Apr. 13, 2022), *report and recommendation adopted*, 2022 WL 2195014 (E.D.Tex. June 17, 2022). Because there were no surviving claims against the supervising entity, there were no claims with which those against the individual official could merge. In the second case, *White v. Townsend*, the

---

[10] Federal Rule of Civil Procedure 65(d)(2) extends the force of injunctions to (1) the parties to a suit; (2) the parties' officers, agents, servants, employees, and attorneys; and (3) "other persons who are in active concert or participation with" either of the previously described groups. FED. R. CIV. P. 65(d)(2)(A)-(C). Merriott has not presented the Court with authority that persuades the undersigned that Free, Montgomery, Darby, or Jacobs presumptively do not fall under any of these categories.

[11] The undersigned observes that such an injunction may necessarily have limited applicability to the members of the Council. Specifically, the force of an injunction may be limited to not encroach upon the legislative function of those defendants. This is a consideration separate and apart from Merriott's concern that official-capacity claims against the Council members should be untouched. Limitations to injunctive relief to protect legitimate legislative action may be imposed regardless of whether the relevant legislators are sued in their official capacity, or such claims are subsumed into claims against the municipality. For instance, an injunction preventing "Defendant from passing the resolution that was discussed during [the Off-the-Record Conference]," [doc. #54, p. 29], may raise separation of powers concerns. However, this issue is not now before the court and is mentioned merely to alert the parties to potential limits on the ultimate resolution of this controversy.

supervising entity was not a named defendant, denying that entity notice and an opportunity to respond, and preventing the official-capacity claims against the defendant official from merging. No. 22-cv-426, 2022 WL 18402557 (E.D.Tex. Nov. 3, 2022), *report and recommendation adopted*, 2023 WL 361071 (E.D.Tex. Jan. 23, 2023).

Merriott's second argument against dismissal of the official-capacity claims is that the claims may be dismissed at a later stage of litigation. [doc. #22, pp. 12-14]. This argument turns, in part, on Merriott's assertion that "[t]here should be no additional burden on Defendants in continuing to defend this litigation" should the official-capacity claims remain. *Id.* at pp. 9-13. The additional burden imposed on the Individual Defendants is manifestly obvious: They will be required to continue defending themselves against these claims. The cost – measured in money, time, and psychological impact – of litigation should not be so lightly dismissed. Indeed, Jacobs would not be a party to this lawsuit at all but for the official-capacity claims. As such, the practical considerations align with the controlling case law to counsel in favor of dismissing the official-capacity claims.[12]

Accordingly, it is RECOMMENDED that the official-capacity claims against Free, Montgomery, Darby, and Jacobs be dismissed.

## III.    Forum Analysis

The permissible scope of government speech restrictions depends on the character of the forum in which the restriction is imposed. *See Perry Educ. Ass'n v. Perry Loc. Educators'*

---

[12] In a footnote, Merriott voices questions about the significance of the Individual Defendants being represented by different counsel than the City. *See id.* at pp. 13 n.1. The undersigned first observes that perhaps these Defendants retained separate counsel because Merriott chose to bring claims against them in their individual capacity which the City may not be liable for. Turning to the substance of Plaintiff's point, he has not requested any action by the Court concerning the representation of Defendants. Should Merriott wish for the court to act on this perceived issue, he may file an appropriate motion.

*Ass'n*, 460 U.S. 37, 44 (1983) ("The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue.").  It is "well settled that the government need not permit all forms of speech on property that it owns and controls." *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) (citing *Postal Serv. v. Council of Greenburgh Civic Assns.*, 453 U.S. 114, 129 (1981); *Greer v. Spock*, 424 U.S. 828 (1976)).  Consequently, when a litigant challenges a speech restriction that the government has placed on the use of its property, courts utilize a "forum based" analytical approach.  *Id.*; *see also Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985) (Because "the Government, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated," courts utilize "a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." (quotation and citation omitted)).

There are four types of government-controlled spaces: traditional public forums; designated public forums; limited public forums; and nonpublic forums. [13]   *See Chiu v. Plano*

---

[13] Briefly, traditional public forums include public streets and parks, spaces "which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009) (quotations omitted). These forums may be subject to reasonable time, place, and manner speech restrictions, but any such restrictions must satisfy strict scrutiny.  *Id.*  The government may create designated public forums in spaces that have "not traditionally been regarded as a public forum [but are] intentional[ly] opened up for that purpose." *Id.*  Strict scrutiny also applies to review of speech restrictions imposed on these spaces.  *See Cornelius*, 473 U.S. at 800 ("[W]hen the Government has intentionally designated a place or means of communication as a public forum speakers cannot be excluded without a compelling governmental interest."). Finally, the category of nonpublic forum recognizes the reality that the First Amendment "does not guarantee access to property simply because it is owned or controlled by the government." *Greenburgh Civic*

*Indep. Sch. Dist.*, 260 F.3d 330, 345-46 (5th Cir. 2001).  The City contends that public comment periods at Council meetings are limited public forums.  [doc. #18, p. 18].  Merriott makes no assertions of his own as to what type of forum the public comment period is, but accepts "for purposes of this motion" that it is a limited public forum.  [doc. #33, p. 28].  These statements align with case law in this district, which indicates that city council meetings are limited public forums.  *See Vincent v. City of Sulphur*, 28 F.Supp.3d 651, 656 (W.D. La. 2014) (citing *Wenthold v. City of Farmers Branch*, 11-CV-0748, 2012 WL 467325, at *8 (N.D. Tex. Feb. 14, 2012) ("[T]he facts support a finding that the City created a limited public forum when it provided for a public comment period [at a] City Council meeting.")), *reversed and remanded on other grounds*, 805 F.3d 543 (5th Cir. 2015).  Furthermore, the Fifth Circuit has held that spaces akin to the public comment period are limited public forums.  *See Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 759 (5th Cir. 2010) (holding the "comment session" of a school board meeting a limited public forum "for the limited time and topic of the meeting").  Appellate courts in sister circuits have also found that city council meetings and similar spaces are limited public forums.  *See Galena v. Leone*, 638 F.3d 186, 198 (3d Cir. 2011) (finding county council meeting a limited public forum); *Steinburg v. Chesterfield Cty. Plan. Comm'n*, 527 F.3d 377 (4th Cir. 2008) (analyzing county planning commission as limited public forum); *Rowe v. City of Cocoa*, 358 F.3d 800, 802 (11th Cir. 2004) (holding city council meeting was limited public forum); *but*

---

*Assocs.*, 453 U.S. at 129.  Nonpublic forums are subject to time, place, and manner regulations and may be reserved for "intended purposes, communicative or otherwise," so long as the regulations are reasonable and not imposed to "suppress expression merely because public officials oppose the speakers' view."  *Perry Educ. Ass'n*, 460 U.S. at 46.

*cf. Surita v. Hyde*, 665 F.3d 860, 869 (7th Cir. 2011) (finding city council meetings designated public forum).[14]

Limited public forums are spaces "opened for public expression of particular kinds or by particular groups."  *Id.* at 346 ; *see also Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995) (describing campus facilities opened to varied student groups as a limited public forum).  The government is justified in reserving these spaces "for certain groups or the discussion of certain topics." *Rosenberger*, 515 U.S. at 829; *see also Christian Legal Soc. Chapter v. Martinez*, 561 U.S. 661, 679 n.11 (2010) ("[G]overnmental entities establish limited public forums by opening property limited to use by certain groups or dedicated solely to the discussion of certain subjects." (quotation omitted)).  However, the government may not discriminate against speech on the basis of viewpoint or content in these forums, and restrictions must be reasonable in light of the purpose served by the forum.  *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001); *see also Martinez*, 561 U.S. at 679 n.11 ("[In a limited public forum], a governmental entity may impose restrictions on speech that are reasonable and viewpoint-neutral").

The undersigned is satisfied that the comment period of Council meetings is a limited public forum and will proceed with analysis on that basis.

---

[14] There is a circuit debate among the circuits about the distinction between designated public forums and limited public forums.  *See Chiu*, 260 F.3d at 345 ("Despite the acceptance of a middle category between traditional and nonpublic forums, there is some confusion over the terminology used to describe this category.").  However, in contrast to the Seventh Circuit, the Fifth Circuit has distinguished a "designated public forum" from a "limited public forum." *See id.*

IV.    **Facial Challenges to the Decorum Policy**

Merriott brings three facial challenges to the Decorum Policy, asserting it is (1) overbroad; (2) vague; and (3) imposes viewpoint- and content-based speech restrictions. [doc. #54, pp. 18-22]. The City opposes all of these claims on various grounds.

a.    *Overbroad Challenge*

In his first facial challenge to the Decorum Policy, Merriott argues that the Conduct Prohibitions, Audience Ban, and Speaker Limit are overbroad. *Id.* at pp. 18-19. The City asserts that this claim is impermissibly predicated on Merriott's own conduct and that the Decorum Policy is properly tailored to serve a legitimate purpose. [doc. #18, pp. 19-23].

A speech regulation is constitutionally overbroad if it "prohibits a substantial amount of constitutionally-protected freedoms [as] judged in relation to the regulation's plainly legitimate sweep." *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1012 (5th Cir. 2023). The overbreadth must be substantial both in relation to that "legitimate sweep" and in an absolute sense. *United States v. Williams*, 553 U.S. 285, 292 (2008). "[A] broadly-written statute may have such a deterrent effect on free expression that it should be subject to a facial challenge even by a party whose own conduct may be unprotected." *International Soc. For Krishna Consciousness of New Orleans, Inc. v. City of Baton Rouge*, 876 F.2d 494, 499 (5th Cir. 1989) (citing *Thornhill v. Alabama*, 310 U.S. 88 (1940)); *see also McClelland*, 63 F.4th at 1012 ("[The overbreadth doctrine] enables a plaintiff to challenge a statute where it infringes on *third parties* . . . ." (alteration in original) (quotation omitted)). However, "overbreadth challenges are not permitted where a party raises only situations that are 'essentially coterminous' with their own conduct." *Seals v. McBee*, 898 F.3d 587, 599 (5th Cir. 2018) (quoting *United States v. Hicks*, 980 F.2d 963, 969-70 (5th Cir. 1992)); *see also Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491,

504 (1985) (In cases where "the parties challenging the statute are those who desire to engage in protected speech that the" statute purports to prohibit, "[t]here is no want of a proper party to challenge the statute [and thus] no concern that an attack on the statute will be unduly delayed or protected speech discouraged.").[15]

Here, the First Amendment rights asserted by Merriott are to some extent coterminous with the expressive rights of putative third parties. Merriott specifically alleges that the reading of the Conduct Prohibitions and Audience Ban at the August 15 Meeting "was an attempt to chill [his] speech." [doc. #54, p. 9]. He further alleges that he "must and does self-censor for fear of removal and/or retaliation." *Id.* at p. 15. These allegations all implicate Merriott's own conduct and rights in relation to the Decorum Policy; they do not implicate those of any third parties. Merriott does attempt to lodge allegations concerning the Decorum Policy's impact on others. For instance, he alleges that "citizens who take positions with which members disagree are silenced and told their comments are off limits." *Id.* at p. 16. However, these allegations are cursory and, insofar as they concern individuals other than Merriott, lack the particularity to cross the line into the realm of plausibility. In the absence of more specific factual allegations, Merriott has failed to show that his overbreadth claims regarding the Conduct Prohibitions are any different from his as-applied challenge against this same provision. This is to say that all of Merriott's well-pleaded allegations implicating this specific provision of the Decorum Policy concern only its application to his conduct, not the conduct of third parties. Accordingly, it would be improper to entertain Merriott's overbreadth challenge to the Decorum Policy's

---

[15] Should a plaintiff whose conduct is covered by a speech restriction challenge that restriction as overbroad, then the restriction is properly analyzed as-applied as opposed to facially. *See Brockett*, 472 U.S. at 504.

Conduct Prohibitions, and this claim should be dismissed. *See, e.g.*, *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801-02 (1984) (finding an overbroad challenge improper when plaintiffs "failed to identify any significant difference between their claim that the ordinance is invalid on overbreadth grounds and their claim that it is unconstitutional when applied to their [own conduct].").

In contrast, Merriott's challenges to the Audience Ban and Speaker Limit survive the initial inquiry that doomed his Conduct Prohibitions claim.[16] Regarding the Audience Ban, Merriott alleges that "[t]here are no criteria or guidelines within the rules for this process, and the very people that removed a citizen would decide" whether he could be "readmitted," noting "[a]n individual could be banned indefinitely." [doc. #54, p. 19]. At this stage of the litigation, Merriott's allegations are sufficient to plausibly state an overbreadth claim as they potentially implicate a substantial amount of constitutionally-protected speech in a manner that is unreasonable in light of the public comment period's purpose. The undersigned emphasizes that the lack of criteria guiding implementation of bans and readmission of banned speakers is key to this finding.

Against this, the City's argument for dismissing the challenge to the Audience Ban is predicated upon out-of-circuit precedent that has only persuasive authority. *See* [doc. #18, p. 23]. The cases cited emphasize that bodies similar to the Council must be empowered to exercise discretion in regulating limited public forums. However, nothing in these cases indicates that such discretion is limitless. In the absence of precedential and on-point case law, the City has not established the presumptive reasonableness of the Audience Ban. Rather, the

---

[16] Merriott does not allege that he was banned from attending Council meetings or that he was impacted by the Speaker Limit. His overbreadth challenge vis-à-vis these provisions thus implicates the rights of third parties, allowing him to proceed past the "coterminous" analysis.

well-pleaded allegations state a plausible overbreadth challenge to the Decorum Policy's Audience Ban.

Turning to the Speaker Limit, Merriott alleges that this provision "is overbroad because it prohibits the wholly protected speech of all speakers after the first four." [doc. #54, p. 19]. Merriott's allegations are sufficient to plausibly state an overbreadth claim as he again pleads that this provision is unreasonable under limited public forum analysis. Merriott notes that "[d]ue to the lack of guidance, it is unclear how [the Speaker Limit] would be enforced without sweeping in large swaths of protected speech because the rules do not explain how to determine which 'side' a speaker is on." [doc. #33, p. 18]. The undersigned observes that this lack of criteria undercuts the presumptive reasonableness of the Speaker Limit. The City's argument for dismissal is again predicated on only persuasive authority from out-of-circuit courts and one in-circuit sister district court. *See* [doc. #18, p. 22]. With one exception, these cited decisions analyze limits to the length of time a participant may speak, not a limit on the number of speakers or a limit on the number of speakers by "side." It is further significant that the one exception, *Hansen v. Westerville City Sch. Dist. Bd. of Ed.*, 43 F.3d 1472 (6th Cir. 1994), is a viewpoint restriction challenge, not an overbreadth challenge. The undersigned is unpersuaded by these cases.

Accordingly, it is RECOMMENDED that the City's motion be granted insofar as it seeks dismissal of the overbreadth challenge to the Conduct Prohibitions and denied to the extent it seeks dismissal of the overbreadth challenge to the Audience Ban and Speaker Limit.

b. *Vagueness Challenge*

Merriott's second facial challenge to the Decorum Policy asserts that the Conduct Prohibitions provision is unconstitutionally vague.  [doc. #54, pp. 19-20].[17]  The City argues the policy is written in commonly understood language that necessarily survives a vagueness challenge.  [doc. #18, p. 24].

A law is unconstitutionally vague if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or afford explicit standards to avoid arbitrary and discriminatory application.  *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 551 (5th Cir. 2008) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)). The Supreme Court has held that a statute is not unconstitutionally vague if "it is [facially] clear what the ordinance as a whole prohibits" or the statute "is surely valid in the vast majority of its intended applications."  *Roy v. City of Monroe*, 950 F.3d 245, 252 (5th Cir. 2020) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).  The Fifth Circuit "has resisted vagueness challenges when the challenged law is couched in 'commonly understood' language because such language tends to provide notice to the public and meaningful guidance to authorities."  *Id.* at 253 (citation omitted).  While "a more stringent vagueness test should apply" to laws implicating First Amendment rights, *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982), the standard facing plaintiffs bringing a facial vagueness challenge against such a law is "daunting."  *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013).

---

[17] Merriott's pleadings make clear he is specifically challenging this provision with his vagueness claim.  *See id.* ("The rules provide no explicit enforcement standards for the Council. Council members may silence speech they subjectively find personal, impertinent, slanderous, or boisterous with unfettered discretion.").

Here, the Decorum Policy prohibits remarks that are "personal," "impertinent," or "slanderous," as well as "boisterous" conduct.  [doc. #54-1, pp. 3-4].  The Fifth Circuit has explicitly held that the concept of "boisterousness" is "familiar to common usage and everyday speech," and is thus "sufficiently clear" to provide fair notice.  *Roy*, 950 F.3d at 253 (quotation omitted).[18]  Similarly, the terms "personal," "impertinent," and "slanderous" are obscure legal concepts, but commonly used words with which people of ordinary intelligence are familiar.[19]  Merriott's citations to out-of-circuit and out-of-district cases are unconvincing.  On this basis, the Decorum Policy provides notice to the public of prohibited conduct and meaningful guidance to the authorities empowered to enforce the policy.

Accordingly, it is RECOMMENDED that the City's motion be granted to the extent it seeks dismissal of Merriott's vagueness challenge.

### c. *Viewpoint- and Content-Based Restraint Challenge*

Finally, Merriott challenges the Decorum Policy on its face, contending that it imposes viewpoint- and content-based restraints on speech.  [doc. #54, pp. 20-22].  The City counters that the regulation is viewpoint neutral.  [doc. #18, p. 25].

"A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."  *Ward v.*

---

[18] While the ordinance at issue in that case did not contain the word 'boisterous,' *see* MONROE CODE ORDINANCES § 12-153, and concerned fair notice in the application of a City's criminal ordinance, the *Roy* court nonetheless was clear that the term "boisterous" is "familiar to common usage and everyday speech."  *Roy*, 950 F.3d at 253 (quotation omitted).  Certainly, if Roy had fair notice that a criminal ordinance could be applied to his conduct, Merriott and others were on notice of prohibited conduct at the Council meeting.  The use of the term "boisterous" is further clarified by its placement amongst its neighbors in the Conduct Prohibitions – "personal," "impertinent," and "slanderous" – to explicate the tone and tenor of conduct that is prohibited.

[19] While the term "slander" may also hold legal significance, its use as a legal concept does not negate its underlying common meaning.

*Rock Against Racism*, 491 U.S. 781, 791 (1989).  While "public bodies may confine their

meetings to specified subject matter," *City of Madison v. Wisconsin Emp. Rels. Comm'n*, 429

U.S. 167, 426 n.8 (1976), a rule is not viewpoint neutral "if it provide[s] that public officials

[can] be praised but not condemned."  *Monroe v. Houston Indep. Sch. Dist.*, 794 F. App'x 381,

383 (5th Cir. 2019) (quoting *Matal v. Tam*, 582 U.S. 218, 249 (2017) (Kennedy, J., concurring)).

"The principal inquiry in determining content neutrality . . . is whether the government has

adopted a regulation of speech because of [agreement or] disagreement with the message it

conveys."  *Rock Against Racism*, 491 U.S. at 791; *see also R.A.V. v. City of Saint Paul*, 505 U.S.

377, 386 (1992) ("The government may not regulate [speech] based on hostility–or favoritism–

towards the underlying message expressed.").

       Here, Merriott argues that the Conduct Prohibitions, Audience Ban, and Speaker Limit all

perpetuate viewpoint-based restraints on speech.  [doc. #54, pp. 20-22].  The Fifth Circuit has

found that restrictions against "disruption" and discussion of "personnel grievances" at a school

board meeting did not constitute viewpoint discrimination.  *See Fairchild*, 597 F.3d at 752-53,

757-61.[20]  While the circumstances in *Fairchild* do not perfectly mirror those before the Court,

the Fifth Circuit's rationale is informative.  In that case, the Fifth Circuit observed that, under the

challenged rules, a speaker could "discuss concerns generally," but could not "move to the merits

of an extant dispute" as doing so "could derail the agenda for the meeting."  *Id.* at 760.  The

prohibitions on "resolution of the merits" during a public comment period was found to be a

"studied effort to manage [the school board's] agenda."  *Id.*  The Fifth Circuit concluded that

---

[20] Merriott contends that *Fairchild* involves a vagueness and overbreadth challenge, not a
viewpoint challenge.  [doc. # 33, p. 26].  This is true, but the Fifth Circuit necessarily determined
whether the restrictions at issue were viewpoint-neutral and reasonable as part of its limited
public forum analysis.  *Fairchild*, 597 F.3d at 762 ("The Board's restrictions in this limited
forum are both viewpoint-neutral and reasonable.").

these restrictions "ultimately do not constrain by the content of protected speech but rather do no more than limit the time, place, and manner for its expression." *Id.* at 761.

The undersigned finds the Decorum Policy's limitations are substantively similar to those at issue in *Fairchild*. As in that case, the Decorum Policy seeks to prohibit public comment that is disruptive and risks derailing discussion away from set agenda items. In so doing, the Decorum Policy limits the time and place (the public comment period of Council meetings) as well as manner (generalized, relevant, and truthful remarks coupled with restrained conduct) of speech it covers. The Decorum Policy makes no reference to acceptance or proscription of any perspective, nor has Merriott affirmatively alleged that the Decorum Policy was drafted with any such intent. While the regulation may have an incidental effect on certain speakers or messages, this is entirely permitted under the First Amendment. In short, the Decorum Policy permissibly confines the scope of expression during public comment periods to relevant topics without exalting celebration of officials over condemnation of them.

Merriott attempts to counter this conclusion with numerous out-of-circuit cases that serve only persuasive authority. The lone Fifth Circuit case he cites, *Monroe*, 794 F.App'x 381, is invoked to support the proposition that the First Amendment does not countenance rules that allow praise or neutral comment, but prohibit criticism or disapproval. *See* [doc. #33, p. 24]. While the *Monroe* court does indeed endorse that rule, it does not make any findings that lead the undersigned to conclude the instant fact pattern is one to which that proposition applies. Neither this case nor the out-of-circuit cases cited by Merriott alter the undersigned's assessment.

Accordingly, it is RECOMMENDED that the City's motion be granted to the extent it seeks dismissal of Merriott's viewpoint- and content-based restraint challenge to the Decorum Policy.

## V.    As-Applied Challenge to the Decorum Policy

Merriott also brings an as-applied *Monell* challenge to the Decorum Policy.  *See* [doc. #54, pp. 22-23].  The City argues that he has failed to establish that the alleged violations occurred pursuant to an official municipal policy or custom, or at the behest of an official policymaker.  [doc. #18, pp. 25-29].

As described *supra*, to successfully state a *Monell* claim, a plaintiff must prove that he was deprived of a federally protected right (1) pursuant to an official municipal policy (2) promulgated by the municipal policymaker (3) that was the moving force behind the constitutional violation.  *Edwards v. City of Balch Springs*, 70 F.4th 302, 307 (5th Cir. 2023).  An official policy may be shown through written policy statements, ordinance, or regulations; a widespread practice that is so common and well-settled as to constitute a custom that represents municipal policy; or a single act conducted by an official or entity with final policymaking authority.  *Sweetin v. City of Texas City*, 48 F.4th 387, 392 (5th Cir. 2022).  For a practice to constitute a custom, it must have occurred for so long or so frequently that "the course of conduct warrants attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice" of municipal employees.  *Martinez v. Nueces Cty.*, 71 F.4th 385, 389 (5th Cir. 2023) (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838, 850-51 (5th Cir. 2009)).  The "single incident exception" is "extremely narrow."  *Valle v. City of Houston*, 613 F.3d 536, 542 (2010) (quoting *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008)).  Indeed, to plausibly plead a practice "so persistent and widespread as to practically have the force of law," a plaintiff must describe more than just the incident giving rise to his putative injury.  *Peña v. City of Rio Grande City*, 879 F.3d 613, 622 (5th Cir. 2018) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).  What constitutes a "persistent and widespread" practice is

not reducible to a clear-cut, mathematically certain formula. However, Fifth Circuit precedent indicates that even numerous instances of a practice may be insufficient to evidence a custom. *See, e.g.*, *Peterson*, 588 F.3d 838 (twenty-seven complaints of excessive force over four years insufficient to establish municipal custom); *Pineda v. City of Houston*, 291 F.3d 325 (5th Cir. 2002) (eleven incidents of warrantless searches of residences insufficient to establish municipal custom).

Concerning the policymaker prong, "[a]ctual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policymaking authority." *Valle*, 613 F.3d at 542 (quoting *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984) (en banc)). The Fifth Circuit distinguishes between final policymaking authority and final decisionmaking authority. *Id.* An individual is a final policymaker (and thus potentially liable under § 1983) if they are responsible for making law or setting policy in a given area of municipal business, *Sweetin*, 48 F.4th at 392, while a final decisionmaker can be liable under that law only if they posses "final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). "[D]iscretion to exercise a particular function does not necessarily entail final policymaking authority over that function." *Bolton*, 541 F.3d at 549. The question of whether an official possesses final policymaking authority for purposes of municipal liability is a question of state and local law. *Pembaur*, 475 U.S. at 483.

Here, the City contends that Merriott has failed to allege the existence of an official policy or custom and has failed to allege the promulgation of such a policy or custom by a policymaker. [doc. #18, pp. 27-29]. That is, the City contends that Merriott alleges that he complied with the Decorum Policy, but that he was censored anyway. He fails to show that any

such censorship was placed upon established custom.  Finally, he places the blame on Free, Darby, and Montgomery without sufficient allegations to identify them as final policymakers.

Merriott has sufficiently pleaded that the Decorum Policy constitutes an official municipal policy.  *See generally* [doc. #54] (alleging throughout that Merriott's First Amendment rights were infringed by officials referencing the Decorum Policy as authority); *see also* [doc. #54-1].  The City has not contested that the Decorum Policy represents official municipal policy.  Rather, Merriott stumbles in alleging that any putative violations of his rights were made pursuant to the Policy.  He specifically identifies several instances in the Complaint where he alleges "violations committed against him were pursuant to the official Policy of Bossier City."  [doc. #33, p. 31].  The allegations are the following:

- "[The] City Council, its members, and Defendant Jacobs have run afoul of Plaintiff's rights, and have done so through official policy and custom of the City . . . ."  [doc. #54, p. 3].

- Free "sets policy and custom" for the City "as to the conduct of its council meetings" and "had enforced a raft of unconstitutional policies and practices."  *Id.* at pp. 3-4.

- Darby instructed the city clerk to read the Decorum Policy to Merriott in "an attempt to chill [his] speech by threatening removal and a bar from all future meetings."  *Id.* at p. 9.

- The Council "does not uniformly enforce public comment rules."  *Id.* at p. 15.

- The Defendants applied the Decorum Policy against Merriott "in a viewpoint- and content-based manner" that swept "large swathes of protected speech within their ambit of proscription."  *Id.* at p. 22.

26

- Free, Darby, and Montgomery applied the Decorum Policy "to silence Merriott's speech." *Id.*

- Merriott's speech was constitutionally protected but "swept within the ambit of the Council's proscriptions," although "[i]t would not be clear to a reasonable person that [those] limitations" applied to his speech. *Id.* at pp. 23.

Merriott fails to sufficiently plead that the Decorum Policy is the moving force behind any of the alleged constitutional violations.

The first and second allegations are conclusory and thus insufficient to plausibly state a constitutional violation. The third and sixth may allege specific constitutional violations, but these putative violations were not made pursuant to the Decorum Policy. The violation in the third allegation is predicated on the reading of the policy, an act that is not contemplated by the Decorum Policy and thus not made pursuant to it.[21] The sixth allegation asserts that Free, Darby, and Montgomery applied the Decorum Policy, but Merriott's own pleadings undercut this: The enforcement mechanism of the policy is a ban from the City Council meeting audience, yet nowhere does Merriott allege he was subject to such a ban. The fourth allegation is unsupported by well-pleaded facts of meaningful specificity and is thus facially implausible. Finally, the fifth and seventh allegations are legal conclusions that the court is not obliged to accept as true at the pleading stage. In short, Merriott has successfully pleaded that an official policy exists, but he has failed to allege that the putative constitutional violations he suffered were made pursuant to said policy.

---

[21] The Decorum Policy does not direct Council members to interrupt speakers, threaten to remove them from Council meetings, or discriminate against speakers on the basis of their viewpoints. Consequently, any conduct of this nature would not have been made pursuant to the City's official policy.

Despite this setback, Merriott could have established that his rights were violated pursuant to an official custom of the City.  However, he fails in this regard as well.  The Amended Complaint generally concerns five Council meetings from July to September 2023, with the alleged violations occurring at the meetings on August 1, August 15, and September 5, 2023.  [doc. #54, pp. 5-14].  In light of controlling Fifth Circuit precedent, *see Peterson*, 588 F.3d 838; *Pineda*, 291 F.3d 325, three incidents over the course of three months falls short of evidencing a persistent and widespread practice.[22]  Even more damning is that Merriott only offers allegations concerning the incidents giving rise to his own putative injuries.  Conclusory allegations devoid of specifics or identifying details regarding other putative rights violations are patently inadequate to cure this defect.  *See, e.g.*, [doc. #54, pp. 14-15] ("The Council does not uniformly enforce public comment rules[.] . . . [C]itizens who take positions with which members disagree are silenced and told their comments are off limits, even when their comments are clearly linked to agenda items and matters of public concern.").  Therefore, Merriott has failed to sufficiently allege the existence of a custom so widespread and persistent that it constitutes municipal policy.

Finally, Merriott has also failed to plead that any policy or custom was promulgated by a final policymaker, preventing him from proceeding under the single incident exception.  As Merriott acknowledges, controlling municipal law vests "[a]ll powers of the City" in the Council.  Bossier City, La., City Charter § 3.07 (2023); *see also* [doc. #33, p. 34].  That same law declares that "[n]o action of the City Council shall be valid or binding unless adopted by the affirmative vote of a majority of the City Council membership."  Bossier City, La., City

---

[22] Merriott offers no case law that shows a "practice" of this scope and frequency constitutes a municipal custom.

CHARTER § 3.13(f).  The sum of these provisions is that only actions adopted by the Council via majority vote constitute the conduct of an entity with final policymaking authority; individual Council members lack final policymaking authority.  None of the violations that Merriott alleges were adopted by a majority vote of the Council.  Thus, none of these putative violations were conducted by an entity with final policymaking authority.

Merriott attempts to side-step this hurdle by asserting that the Council delegated its policymaking authority to Free.  [doc. #33, p. 35].  In support of this proposition, he points to the Council's procedural rules, which direct the President Pro-tem to "preserve strict order and decorum" at meetings.  [doc. #54-1, p. 2].  This provision represents a delegation of decision-making authority, not policymaking authority.  In preserving order and decorum, the President Pro-tem is not "making law or setting policy," but is rather exercising discretion in *implementing* municipal law and policy.  Merriott attempts to make a similar argument concerning Montgomery and Darby, contending that they are final policymakers "as they set custom and practice their [sic] routine administration of [Council] meetings."  [doc. #33, p. 36].  He points to no ordinance, rule, or other legally binding instrument to support this assertion.  Instead, the conduct of Montgomery and Darby that Merriott refers to is accurately described as discretionary implementation of particular functions, which does not rise to the level of policymaking.

Accordingly, it is RECOMMENDED that the City's motion be granted to the extent it seeks dismissal of Merriott's as-applied challenge to the Decorum Policy.

## VI.    Retaliation Claim

Merriott also brings a First Amendment retaliation claim predicated on various actions by Defendants.  [doc. #54, pp. 23-24].  The City asserts that Merriott has failed to state a retaliation

claim and, even if he did state such a claim, he has failed to establish that the municipality is liable for any such misconduct.  [doc. #18, pp. 29-32].

To state a First Amendment retaliation claim, a plaintiff must show that (1) he engaged in constitutionally protected activity; (2) the defendant's actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant's adverse actions were substantially motivated against the plaintiff's continued exercise of constitutionally protected activity.  *Villarreal v. City of Laredo*, 44 F.4th 363, 373 (5th Cir. 2022).  The Fifth Circuit has clarified that a successful retaliation claim requires "some showing that *the plaintiff['s]* exercise of free speech has been curtailed."  *Keenan v. Tejeda*, 290 F.3d 252, 259 (5th Cir. 2002) (emphasis in original).  This requires allegations that the plaintiff "reduced or changed his exercise of free speech."  *McLin v. Ard*, 866 F.3d 682, 697 (5th Cir. 2017).[23]

Merriott alleges four instances of retaliation:

- Free and Montgomery interrupting Merriott at the August 1 Meeting.  [doc. #54, pp. 7, 24].

- McGraw reading portions of the Decorum Policy – including the Audience Ban – during the August 15 Meeting.  *Id.* at p. 24.

---

[23] The *Villarreal* court noted that this standard differs from that in other circuits, which do not require a plaintiff to make a showing that their own activity was altered by the alleged misconduct of defendants.  *Compare Villarreal*, 44 F.4th 363 *with Smith v. Plati*, 258 F.3d 1167, 1177 (10th Cir. 2001) ("The focus . . . is upon whether *a person of ordinary firmness* would be chilled, rather than whether the particular plaintiff is chilled.") *and Mendocino Env't Ctr. V. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) ("[I]t would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity.").  However, the Fifth Circuit has declined to alter its standard to comport with the one used in other circuits.  *Villarreal*, 44 F.4th at 374 ("We are duty-bound to follow our circuit precedent.").

- Free and Darby interrupting Merriott at the August 15 Meeting.  *Id.* at pp. 9, 24.

- Montgomery and Darby "proposing a resolution to eliminate public comment on agenda items."  *Id.* at p. 24.

The City does not contest that Merriott was engaged in constitutionally protected activity and does not make assertions concerning the motivation behind the alleged misconduct.  What it does challenge is whether Merriott suffered an actionable retaliation injury.  [doc. #18, pp. 31-32].  With binding Fifth Circuit precedent as a guide, analysis of the allegations indicates that Merriott did not suffer any cognizable harm.  McGraw's reading of the Decorum Policy is not alleged to have altered his speech or conduct.  Indeed, it is alleged that Merriott went on to speak at the September 5 and the September 19 Meetings, [doc. #54, pp. 10-12], which indicates he was unaffected by McGraw's conduct.  Furthermore, the pleadings indicate that the reading "was *an attempt* to chill Plaintiff Merriott's speech," *id.* at p. 9 (emphasis added), which is substantively different from the reading affirmatively chilling his speech.  There are no allegations that Merriott altered his speech or conduct in reaction to the interruptions of Free, Darby, or Montgomery.  Again, Merriott alleges that he spoke at several Council meetings after the initial August 1 interruption episode, evidencing no reduction or alteration in his speech.  *See id.* at pp. 8-12 (describing Merriott speaking at the August 15, September 5, and September 19 Meetings).  It should be noted that Merriott alleges the complained-of conduct "would chill a person of ordinary firmness and did in fact chill [his] speech."  *Id.* at p. 24.  This conclusory statement is insufficient to establish that he "reduced or changed his exercise of free speech," especially in light of the allegations that he did not in fact alter his conduct.  Consequently, it would be improper to find that Merriott has sufficiently pleaded the injury element of a First Amendment retaliation claim.

Even if Merriott suffered a cognizable injury on account of the alleged retaliation, the claim necessarily fails if the City cannot be held liable for the misconduct. As discussed *supra*, to state a *Monell* claim Merriott must sufficiently allege that the purported rights violation occurred pursuant to an official municipal policy or custom. Merriott has not alleged that it was the City's policy or custom to read the Decorum Policy at Council meetings. As established *supra*, Darby is not a final policymaker, so directing McGraw to read the Decorum Policy was not municipal policy or custom either. Rather, this represented discretionary conduct falling under the decision-making power for which *Monell* liability does not attach.

Merriott also fails to allege that it was a policy or custom to interrupt speakers at these meetings. Allegations that the Decorum Policy was read to him at a single meeting and he was interrupted at two consecutive Council meetings are insufficient to evidence practices so persistent and widespread as to practically have the force of law.

Finally, discussion of introducing a resolution to change the procedures of Council meetings cannot constitute a policy or custom. It has already been established that Montgomery and Darby are not individually final policymakers. In the absence of a majority vote by the Council, the proposed ordinance remains just that: an inchoate potentiality. The gravamen of these findings is that the City cannot be held liable for the conduct that Merriott asserts gave rise to his retaliation claim.

Accordingly, it is RECOMMENDED that the City's motion be granted to the extent is seeks dismissal of Merriott's First Amendment retaliation claim.

## VII.    Challenge to the Gag Order

Merriott's sixth claim challenges the Gag Order as unconstitutionally chilling protected speech. *Id.* at pp. 24-25. The City counters that Merriott lacks standing to bring this claim and

the municipality cannot be held liable as the Gag Order is not an official policy or custom, nor was it promulgated by an official policymaker.  [doc. #18, pp. 32-34].

Standing is a jurisdictional requirement concerning not the issues to be litigated but rather the party seeking to litigate in federal court.  *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 869 (5th Cir. 2000).  "Before ruling on the merits of the case, it is imperative that the court first determine whether it has jurisdiction to hear the suit; if jurisdiction is lacking, then the court has no authority to consider the merits."  *Cook v. Reno*, 74 F.3d 97, 99 (5th Cir. 1996).  Therefore, courts have an ongoing duty to examine whether plaintiffs have standing to bring their putative claims.  *See* FED. R. CIV. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("[O]ur standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press.").  Constitutional standing – also known as Article III standing – is predicated on three requirements: (1) the plaintiff must have suffered an "injury in fact" that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) there must be a fairly traceable causal connection between the injury and conduct complained of; and (3) it must be likely, as opposed to speculative, that a favorable decision will redress the injury.  *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).[24]

---

[24] Federal court jurisdiction is limited to certain "cases" and "controversies."  *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 408 (2013).  The doctrine of standing is a child of the "essential and unchanging" case-or-controversy requirement of Article III.  *Lujan*, 504 U.S. at 560.

The City contends that Merriott lacks standing to challenge the Gag Order.  [doc. #18, pp. 32-33].[25]  The order is allegedly directed to "the City Council and others."  [doc. #54, p. 14]. Merriott does not allege that the Gag Order was directed towards him or that it is applicable to his own speech.  If any speech is implicated by the order, it is that of the Council and others, not that of Merriott.  Furthermore, Merriott has not alleged that the Gag Order has ever been enforced.  It is axiomatic that Merriott has not been injured by a municipal directive that neither applies to him nor has ever been applied to anyone else.  *See Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 (5th Cir. 2024) ("Plaintiffs lack standing [as t]hey have never been arrested or prosecuted for violating [the challenged state law].  And the available evidence suggests Defendants have never enforced [the challenged state law] against Plaintiffs (or anybody else).").

Merriott counters that the Gag Order "will certainly create fear in future potential whistleblowers," which has denied him of his "right to receive information and ideas" as a journalist.  [doc. #54, p. 25]; *see also, e.g.*, *Davis v. E. Baton Rouge Parish Sch. Bd.*, 78 F.3d 920, 927 (5th Cir. 1996) (finding news agency sufficiently alleged injury to First Amendment right to gather the news when existence of "a willing speaker" was alleged).  The operative words here are "future" and "potential."  According to Merriott's own pleadings, any injury he may incur is conjectural and hypothetical.  Nevertheless, he insists that the initial leak of the conversation between Darby and Montgomery inexorably leads to the reasonable inference "that speakers are taking [Jacobs'] email and threats seriously and are not discussing the secret

---

[25] Constitutional standing challenges are properly analyzed under Federal Rule of Civil Procedure 12(b)(1).  *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011).  The City has predicated its motion on Federal Rule of Civil Procedure 12(b)(6), not 12(b)(1).  However, this is of no moment considering this court's overriding obligation to ensure it has subject-matter jurisdiction over all of Merriott's claims.

meeting," thus evidencing the existence of a willing speaker.  [doc. #33, p. 44].  This chain of events is possible, but nowhere in controlling pleadings does Merriott make any allegations that they have in fact occurred.  Finally, Merriott insists that "the threat of enforcement" in the instant case is clear, direct, and proximate in part because Jacobs "threatened wiretapping charges." *Id.* at p. 45.  With all due respect to Jacobs and the office of Bossier City Attorney, he lacks the ability to initiate an FBI wiretapping investigation; this aspect of the Gag Order standing on its own is insufficient to clearly evidence a threat of enforcement.  Accordingly, Merriott has failed to show that he has suffered an actual or imminent injury because of the Gag Order and thus has failed to establish that he has standing to challenge the alleged policy.

In the alternative, and only if the Court find that Merriott has standing to challenge the Gag Order, he nonetheless fails to allege that the order was implemented by a final policymaker. As discussed *supra*, the question of whether an official possesses final policymaking authority for purposes of municipal liability is a question of state and local law.  *Pembaur*, 475 U.S. at 483.  Looking to the Bossier City Charter, the City's Legal Department (of which the City Attorney is "the head") primarily serves an advisory role.  *See* BOSSIER CITY, LA., CITY CHARTER § 8.01-02.[26]  The powers to "provide legal guidance," "[submit] written opinions on

---

[26] The full text describing the powers of the City's Legal Department reads as follows:

> This Department shall provide legal guidance to the Mayor, City Council and all departments of City government. It shall furnish the City Council, and/or any member thereof, or any board or commission established by this plan of government or by ordinance, a written opinion on any question of law involving their official powers and duties. At the request of any member of the City Council, this department shall prepare ordinances and resolutions for consideration by that body, and shall inform the Mayor of such requested actions prior to City Council agenda meetings. A review and recommendations shall be made on all bonds, deeds, leases, agreements, contracts or other instruments to which the City is a party or in which it has an interest. This department shall also be responsible for representing or supervising representation of the City in all litigation including the

any question of law," and "furnish ordinances and resolutions for consideration" do not constitute final policymaking. Rather, these powers enable the City Attorney to advise and support the Council, the entity which itself is the final policymaker. While it is true that the Mayor "shall establish policy and management regulations . . . prescribing the duties and responsibilities of all employees of the City," *id.* at § 7.02, it does not necessarily follow that the Mayor's nomination – and the Council's confirmation – of the City Attorney delegates final policymaking authority to that office. Indeed, Merriott has not alleged that the Gag Order was made pursuant to any direction from the Mayor or any authority delegated from the Mayor to Jacobs. Consequently, relevant municipal law does not indicate that Jacobs is a final policymaker for purposes of the Gag Order.

Merriott's argument that the Council and Mayor ratified the Gag Order, thus giving it the imprimatur of official municipal policy, is also unavailing.[27] The facts here are fundamentally dissimilar from the cases Merriott cites in support of his ratification argument. In *St. Maron Properties, LLC v. City of Houston*, the relevant final policymakers explicitly directed a lower-level functionary to act in an unconstitutional manner. *See* 78 F.4th 754, 761 (5th Cir. 2023)

---

prosecution of ordinance violations in the City Court. The City Attorney, within his/her budget, shall be responsible for hiring the legal staff and support personnel necessary to facilitate the duties of this department. The Legal Department shall also be responsible for acquiring and monitoring any outside legal assistance the City may require.

*Id.* at § 8.01.

[27] Merriott did not present this line of reasoning as an alternative to his contention that Jacobs is a final policymaker. That puts the two arguments in tension with one another. Either Jacobs is a final policymaker and his actions are thus municipal policy, or he is a subordinate whose actions are capable of being ratified by a final policymaker as municipal policy. If Jacobs is a final policymaker, there would be no need to ratify his actions (although they could presumably be rescinded or otherwise challenged).

("[T]he complaint alleges that Houston is liable because the Mayor and Council directed the City Attorney's Office and Public works to carry out their unconstitutional scheme.").  There are no allegations in the instant case that the Mayor, the Council, or any other putative final policymaker directed Jacobs to issue to the Gag Order.  In *Culbertson v. Lykos*, the final policymaker took affirmative policy action based upon the improper recommendation of a subordinate.  *See* 790 F.3d 608, 621-22 (5th Cir. 2015) (describing subordinate municipal officials meeting in private "with representatives from the Commissioners Court" to recommend award of a contract to the plaintiff's competitor three weeks prior to the Commissioners Court "approv[ing] a budget" awarding the aforesaid contract to the competitor).

Merriott has alleged that final policymakers in the instant case "tolerated, ratified, and acquiesced" to the Gag Order by declining to "stop or rescind" it, not by taking affirmative action to do so.  A majority vote by the Council is required to make an action of that body valid or binding.  BOSSIER CITY, LA., CITY CHARTER § 3.13(f).  No such vote is alleged.  Nor are there allegations that the Mayor or Council have taken any actions pursuant to the Gag Order (e.g., by reprimanding employees for speaking).  Merriott has thus failed to plausibly allege that any final policymakers have ratified the Gag Order as municipal policy.

Accordingly, it is RECOMMENDED that the City's motion be granted to the extent it seeks dismissal of Merriott's challenge to the Gag Order.

## VIII.    Open Meetings Law Claim

Merriott proposes two theories of harm under Louisiana's Open Meetings Law.  First, he alleges that the Decorum Policy violates that law.  [doc. #54, pp. 26-27].  Second, he alleges that the Off-the-Record Conference violated the Open Meetings Law.  *Id.* at pp. 27-28.  The City and the Individual Defendants contend that Merriott's challenge to the Decorum Policy is untimely

and unfounded and that Merriott has failed to state an actionable claim as to the Off-the-Record Conference.  [doc. #18, pp. 34-39]; [doc. #55-1, pp. 2-3]; [doc. #56-1, pp. 9-18].

Louisiana law generally requires meetings of public bodies to be open to the public.  LA. REV. STAT. § 42:14(A).  A "public body" under the Open Meetings Law include "village, town, and city governing authorities . . . and any other state, parish, municipal, or special district boards, commissions, or authorities, and those of any political subdivision thereof, where such body possesses policy making, advisory, or administrative functions, including any committee or subcommittee."  *Id.* at § 42:13(A)(3).  The statute defines "meeting" as "the convening of a quorum of a public body to deliberate or act[, or] to receive information regarding a matter over which the public body has supervision, control, jurisdiction, [or] advisory power."  *Id.* at § 42:13(A)(2).  A "quorum" is constituted by a simple majority of the total membership of the relevant public body.  *Id.* at § 42:13(A)(4).  While provisions of the Open Meeting Law are construed liberally, *id.* at § 42:12, they do not cover gatherings of members of the public body "at which there is no vote or other action taken, including formal or informal polling of the members."  *Id.* at § 42:13(B).  The statute does "not prohibit the removal of any person or persons who willfully disrupt a meeting to the extent that orderly conduct of the meeting is seriously compromised."  *Id.* at § 42:17(C).  Suits to void an action taken in violation of the statute or to impose civil penalties for the same must be instituted within sixty days of the violation.  *Id.* at § 42:24.

### a.    *Open Meetings Law Challenge to the Decorum Policy*

First, Defendants argue that Merriott's challenge to the Decorum Policy under the Open Meetings Law is untimely because the Decorum Policy was enacted in 2021 and cannot be voided.  [doc. #18, p. 35].  However, Merriott clarifies that he is "not attempting to void"

38

passage of the Decorum Policy, but rather obtain "a declaration that [the policy] violate[s] the Open Meetings Laws [sic]."  [doc. #33, pp. 53-54]; *see also* [doc. #54, p. 29] (Plaintiff seeks "[d]eclaratory relief stating that Defendants' policies and practices violate . . . the Louisiana Open Meetings Laws [sic], facially and as applied[.]").  Therefore, Defendants' first argument fails.

Second, Defendants argue that the Open Meetings Law regulates "actions of governmental bodies, not the parameters of their rules of procedure."  [doc. #18, p. 36-37].  Defendants make no citation to support this contention, but point to a provision that prohibits certain voting procedures and requires public comment periods.  *See id.* at p. 36 (citing LA. REV. STAT. § 42:14).  Merriott counters by highlighting numerous provisions in the statute governing removal of individuals, LA. REV. STAT. § 42:17(C), public comment during school board meetings, *id.* at § 42:15(A), and notice, agenda-setting, and public comments regarding agenda changes.  *Id.* at § 42:19.  These provisions appear to show that the Open Meetings Law does in fact regulate rules of procedure.  Furthermore, there is no basis to find a distinction between actions of governmental bodies and rules of procedure in the context of the statute.  The undersigned finds that the City's argument is unsupported by the plain text of the law.

Notwithstanding these findings, Merriott cannot invoke the remedy he seeks. Declaratory judgment is available to any person "who has been denied any right conferred by the provisions" of the Open Meetings Law.  *Id.* at § 42:25(C).  Plaintiff was not removed from any meeting, nor was he barred from attending any meetings.  As discussed *supra*, Merriott's First Amendment as-applied challenge has failed.  Therefore, Merriott is not empowered to bring an enforcement action under the Open Meetings Laws and is incapable of obtaining a declaratory judgment under the statute.  It should also be noted that Merriott's allegation that the

requirements of the Decorum Policy "do not comport with the liberal interpretation" of the Open Meetings Law, [doc. #54, p. 27], is a legal conclusion that this Court need not accept at true at the pleading stage.  Finally, the request for "[d]eclaratory relief stating that Defendants' policies and practices violate" the Open Meetings Law, *id.* at p. 29, is improper as federal courts may not "instruct[] state officials on how to conform their conduct to state law."  *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); *see also Ibarra v. Texas Emp. Comm'n*, 823 F.2d 873, 877 (5th Cir. 1987) (*Pennhurst* "proscribes federal courts from requiring states to conform their conduct to state law *qua* state law.").

Accordingly, it is RECOMMENDED that the Defendants' motions be granted to the extent they seek dismissal of Merriott's claim that the Decorum Policy violates the Open Meetings Law.

b.  *Open Meetings Law Challenge to the Off-the-Record Conference*

With regard to Merriott's challenge to the Off-the-Record Conference under the Open Meetings Law, the Defendants argue that no "meeting" as defined by the statute occurred. Alternatively, if a meeting did occur, the City contends that it cannot be held liable for civil penalties applied to Darby, Free, and Montgomery.  [doc. #18, pp. 37-39].  Darby and Montgomery assert that Merriott has failed to allege that they violated a statutory right.  [doc. #56-1, pp. 9-18].

The essential inquiry concerning the Off-the-Record Conference is whether the gathering constitutes a "meeting" as defined by the Open Meetings Law.  Merriott alleges that Montgomery, Darby, and Council members Vince Maggio and Don Williams attended the Off-the-Record Conference.  [doc. #54, p. 15]; [doc. #54-2, p. 2]. As Merriott has thus alleged that four of the seven members of the Council were present at the conference, which constitutes a

quorum of that body.  *See* Bossier City, La., City Charter § 3.01(a) (setting the Council's size at seven members).  However, the mere presence of a quorum does not mean that a meeting occurred for purposes of the Open Meetings Law.  *See* La. Atty. Gen. Op. No. 89-0352 (Aug. 29, 1989), 1989 WL 454320, at *2 ("The mere fact that a quorum is present in any particular location does not cause a violation of the Open Meetings Law.").  Merriott has not alleged that any vote or other affirmative action of the Council took place at the Off-the-Record Conference. Nor has he alleged that the attendees received new information regarding a matter over which the Council has supervision, control, jurisdiction, or advisory power.

Merriott *does* allege that Montgomery observed "Free won't be here [to vote on the resolution under discussion], so is 4 to 2 enough [to pass the resolution]?"  [doc. #54, p. 12]. Relevant precedent makes clear that this remark is not sufficient to constitute formal or informal polling.  In *Brown v. E. Baton Rouge Parish Sch. Bd.*, a committee of the East Baton Rouge Parish School Board met twice in "executive session" [28]  (i.e., not in open public session) to "discuss the character, competence and physical and mental health" of applicants for the Parish Superintendent position.  405 So.2d 1148, 1150 (La. App. 1 Cir. 10/12/1981).  During these executive session meetings, the committee engaged in general discussion of candidates before winnowing the field by "writ[ing] down on separate slips of paper" the names of preferred candidates, with the top vote-getters moving to the next round of consideration.  *Id.* at 1152.  The *Brown* court held that the listing of favored candidates "was a vote taken in closed sessions, which had the effect of a written, secret ballot."  *Id.* at 1153.  The court noted that "public bodies

---

[28] The undersigned notes that none of the parties have described the Off-the-Record Conference as an executive session. However, the validity of these sessions was challenged under the provision now designated as Louisiana Revised Statute § 42:14, which is the same provision invoked here.

cannot meet in private, closed sessions and effectively make decisions, which are merely re-enacted pro forma, in a later open session." *Id.*

Here, there are no allegations that the attendants of the Off-the-Record Meeting affirmatively committed, even provisionally, to voting one way or another on the resolution discussed. Rather, Montgomery is alleged to have asked whether a four-to-two vote would be sufficient to pass the resolution. This is a distinction with a legally significant difference as Montgomery was merely asking whether a hypothetical vote count would be adequate, not making a decision that would render subsequent voting *pro forma*. The former is permissible, while the latter is prohibited. *See id.* ("[O]nly 'discussion' is allowed by the exception [to the Open Meetings Law and] the procedure employed by the Committee went well beyond mere discussion and, in fact, became a selection or vote . . . ."). Montgomery and Darby "count[ing] if they would have enough members to make the resolution," [doc. #54, p. 12], is similarly an exercise in assessing a potential vote rather than conducting one. To wit, the alleged conduct of Montgomery and the other attendees of the Off-the-Record Conference does not constitute "polling" [29] as understood by the Louisiana Attorney General. *See* La. Atty. Gen. Op. No. 12-0177 (June 11, 2014), 2012 WL 5473807, at. *4-5; La. Atty. Gen. Op. No. 14-0065 (June 11,

---

[29] The Louisiana Attorney General referred to definitions of "poll" in Black's Law Dictionary, specifically highlighting the following as relevant in the Open Meetings Law context: (1) "[a] sampling of opinions on a given topic, conducted randomly or obtained from a specified group"; (2) "[t]he result of the counting of votes"; (3) "[t]o ask how each member of (a group) individually voted"; and (4) "[t]o question (people) so as to elicit votes, opinions, or preferences." Op. No. 14-0065, 2014 WL 12958982, at *1-2; *see also Poll*, Black's Law Dictionary (8th ed. 2004). There are no allegations that Montgomery obtained a sample to determine the predicted support of the proposed resolution, that the predicted support numbers were based on a vote, or that Montgomery questioned attendees of the Off-the-Record Conference to elicit votes.

2014), 2014 WL 12958982, at *1-2.[30]  As the attendees of the Off-the-Record Conference did

not act, vote, or receive new information as defined under the Open Meetings Law, the gathering

was not a meeting under that law.  Because the Off-the-Record Conference was not a meeting, it

was not subject to regulation by the Open Meetings Law.

    Accordingly, it is RECOMMENDED that the motions be granted to the extent they seek

dismissal of Merriott's claim that the Off-the-Record Conference ran afoul of the Open Meetings

Law.[31]

---

[30] The Louisiana Attorney General opinion letters cited by Merriott do not alter the undersigned's analysis.  The October 18, 1985 opinion cited by Merriott concerns executive sessions held by the Orleans Parish School Board wherein the Board considered matters exceeding the scope of publicly available notice describing the session and conducted at least one poll vote that was subsequently ratified in open session.  La. Atty. Gen. Op. No. 85-0789 (Oct. 18, 1985), 1985 WL 203050.  Here, there was no executive session called nor was a poll vote conducted and subsequently ratified.  The June 11, 2014, opinion concerns an Ascension Parish Councilmember conducting a poll of other Council members to affirmatively determine how they planned to vote.  Op. No. 14-0065, 2014 WL 12958982.  As discussed *supra*, no poll has been alleged here.  In relevant part, the October 11, 2012, opinion indicates "the Open Meetings Law prohibits questioning a majority of a public body on how each member intends to vote."  Op. No. 12-0177, 2012 WL 5473807, at *6.  Again, there are no allegations that Montgomery or any other attendee of the Off-the-Record Conference questioned a majority of Council members as to how they would vote on the discussed resolution.

[31] The undersigned observes that informal gatherings of municipal lawmakers are necessary for the functioning of government.  It goes without saying that "[i]t is essential to the maintenance of a democratic society that public business be performed in an open and public manner[.]"  LA. REV. STAT. § 42:12(A).  The light of this maxim is not undimmed in the presence of practicalities.  If every conversation between lawmakers was subject to regulation, the compromise and legislative strategy required in a democratic, plural society would be rendered impracticable.  *See Mabry v. Union Par. Sch. Bd.*, 974 So.2d 787, 790 (La.App. 2 Cir. 1/16/08) ("[T]he informal exchange of ideas and opinions preliminary to a meeting of elected officials is important for the issues of agenda setting and compromise that make a deliberative body function efficiently.").

## IX.    Louisiana State Constitution Claims

Merriott's final claims are predicated on alleged violations of his free speech rights under the Article I, § 7 of the Louisiana Constitution, and his right to observe public bodies under Article XII, § 3 of the Louisiana Constitution.  [doc. #54, pp. 28-29].[32]

### a.  Article I, Section 7 of the Louisiana Constitution

The parties agree that the rights protected under Article I, § 7 of the Louisiana Constitution are "coextensive with the First Amendment of the United States Constitution." [doc. #18, p. 39] (citing *O'Daniel v. Indus. Serv. Sols.*, 922, F.3d 299, 307 (5th Cir. 2019); *City of Baton Rouge v. Ross*, 654 So.2d 1311, 1335 n.13 (La. 4/28/95) (Calogero, J., concurring)); *see also* [doc. #33, p. 57] ("Plaintiff does not disagree with Defendant's contention that the analysis and reasons supporting the dismissal of Plaintiff's First Amendment claims apply to the Louisiana free speech claims.").  Merriott does not specifically plead how his free speech rights under the Louisiana Constitution were violated (e.g., whether the Decorum Policy is overbroad, was applied unconstitutionally, etc.).  However, Defendants only challenge Merriott's § 7 claim on the basis that "the analysis and reasons supporting dismissal of [his] First Amendment claims apply with equal force to . . . his Louisiana constitutional free speech claims."  [doc. #18, p. 39]. The undersigned thus analyzes the § 7 claims as if they are coextensive with the First Amendment claims and proposes the same recommendations described *supra*.

Accordingly, it is RECOMMENDED that the City's motion be granted insofar as it seeks dismissal of any overbreadth challenges under § 7 to the Conduct Prohibitions, denied to the

---

[32] Article I, § 7 guarantees that "[n]o law shall curtail or restrain the freedom of speech of the press.  Every person may speak, write, and publish his sentiments on any subject but is responsible for abuse of that freedom."  LA. CONST. art. I, § 7.  Article XII, § 3 states that "[n]o person shall be denied the right to observe the deliberations of public bodies and examine public documents."  *Id.* at art. XII, § 3.

extent it seeks dismissal of any overbreadth challenge under § 7 to the Audience Ban and Speaker Limit, granted to the extent it seeks dismissal of any vagueness challenge under § 7, granted to the extent it seeks dismissal of any viewpoint- and content-based restraint challenges under § 7, granted to the extent it seeks dismissal of any as-applied challenge under § 7, granted to the extent is seeks dismissal of any retaliation claim under § 7, and granted to the extent it seeks dismissal of any challenge to the Gag Order under § 7.

   *b. Article XII, Section 3 of the Louisiana Constitution*

  The City asserts that Merriott's allegation that "Defendants' actions" violated his rights to observe public bodies is conclusory and thus insufficient to survive a Rule 12(b)(6) motion.  [doc #18, p. 40]; *see also* [doc. #54, p. 29] ("Defendants' actions violate Plaintiff's rights to observe public bodies under [Article XII, § 3].").  While the Amended Complaint does not make it entirely clear to what actions Merriott may refer, he clarifies in his opposition briefing that this claim relates to the Off-the-Record Conference.  [doc. #33, p. 57].  In light of the language in the controlling pleadings and Merriott's clarification of the same, the undersigned analyzes this claim as a challenge to the Off-the-Record Conference.

  The protections of Article XII, § 3 concerning observation of public bodies are codified in the Open Meetings Law.  *See, e.g.*, *Deep S. Ctr for Env't Just. v. Council of City of New Orleans*, 292 So.3d 973, 979 (La. App. 4 Cir. 2/12/20) ("The Louisiana legislature enacted the Open Meetings Law . . . to ensure that the protections of Article XII, § 3 are fulfilled."); *see also Lewnau v. Bd. of Supervisors of S. State Univ.*, 295 So.3d 419, 424 (La.App. 1 Cir. 1/9/20) ("The primary purpose of the Open Meetings Law and [Article XII, § 3] is to protect citizens from

secret decisions made without any opportunity for public input.").[33]  As discussed *supra*, the Off-the-Record Conference was not a meeting of a public body as defined by the Open Meetings Law.  It would thus be improper to find that Merriott's right to observe deliberations of public bodies was implicated by the Off-the-Record Conference.

Accordingly, it is RECOMMENDED that the City's motion be granted to the extent they seek dismissal of the claim under Article XII, § 3 of the Louisiana Constitution.

### Conclusion

For the foregoing reasons,

**IT IS RECOMMENDED** that Defendants' motions to dismiss [docs. #13, 15] be **GRANTED IN PART** and **DENIED IN PART** as set forth herein.

**IT IS FURTHER RECOMMENDED** that claims against Defendants Free, Montgomery, Darby, and Jacobs in their official capacities be **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER RECOMMENDED** that Plaintiff Merriott's First Amendment Vagueness, First Amendment Viewpoint- and Content-based Restraint, First Amendment As-Applied, First Amendment Retaliation, First Amendment Gag Order, Louisiana Open Meetings Law, and Louisiana Constitution Article XII claims be **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER RECOMMENDED** that Defendant City's motion be **DENIED** to the extent it seeks dismissal of Plaintiff Merriott's First Amendment and Article I Overbreadth challenges to the Decorum Policy's Audience Ban and Speaker Limit and that the First Amendment and Article I Overbreadth claims otherwise be **DISMISSED WITH PREJUDICE.**

---

[33] The parties have declined to direct the court to any relevant authority to contest the validity of this proposition.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FED. R. CIV. P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 30th day of August, 2024.

_____
KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE